Jones, Chief Judge,
delivered the opinion of the court:
This suit is for damages for delays alleged to have been caused by defendant’s delivery of faulty cloth for use in the manufacture of army jackets.
The plaintiff contracted to make for the Army 75,000 wool jackets for a consideration of $493,750. The specifications contained the following provisions:
All component parts of the garment shall be cut out of one piece of material * * *.
All component parts of j acket shall be marked or ticketed to insure a uniform shade and proper assembly throughout the garment * * *.
The defendant was to furnish the material, the initial delivery date to be September 15,1948.
Plaintiff’s plant was located at Elverson, Pennsylvania. The company president, who was also its general manager, and had had many years’ experience in the garment industry in New York, went to that city and employed 15 key men who reported at Elverson on September 13 to be ready to begin operations on Wednesday, September 15. Plaintiff furnished them board and lodging but did not pay them that week. After midday Friday, September 17, no material having been received, the men were released and left Elverson at two o’clock that afternoon. The initial delivery of gov- *368 erniment-furnished material arrived at 8:45 o’clock that afternoon.
Plaintiff’s president promptly telephoned as many of the men as he could reach, then went to New York to notify the others to return for work. By the end of the following week enough of the key men were on hand to carry forward plaintiff’s plan of operations.
The key men were to train enough local men and women to do the task under the supervision of the key employees. The method of operation is set out in detail in findings 6, 7, and 8.
The cloth was unrolled on a long cutting table, being laid 40 or 50 plies high; a pattern was marked on the top ply and the cloth cut according to that pattern.
On Monday, October 4, 1948, one of the plaintiff’s employees discovered and called the attention of the company president to the fact that some of the jackets contained pieces which did not match in shade. Further investigation revealed other jackets mismatched in color.
The fault lay in the government-furnished material, which in the same piece of cloth had some varying shades of color.
Plaintiff’s president had never encountered such a situation. It was more than a week before he found the trouble. In the meantime he began ripping apart the faulty garments in an effort to match them properly, checked every operation and operator in the plant, and almost disrupted his organization by accusing employees of negligence. In his impatience his language perhaps became somewhat colorful.
Upon locating the source of the trouble the plaintiff immediately called the local inspector, who suggested a conference with defendant’s chief inspector. The conference was held in New York on October 13, 1948, the day following that on which the trouble was located. Some of the faulty cloth and jackets were taken to New York for examination.
After finding the cloth shaded in the piece the chief inspector conferred with the contracting officer and other officials of the Quartermaster Corps, and then conferred again with plaintiff’s president.
The chief inspector told plaintiff that the decision as to what to do in the matter would be confirmed in writing by *369 the contracting officer, but that in the meantime plaintiff could proceed; that the Government would pay for the jackets made from the faulty material, but that the plaintiff should set aside all jackets in which the defect was visible at a distance of more than three or four feet, as to which special instructions would later be issued to the inspector.
At the conference it was found that the faulty cloth had come from the Eedstone mill.
Plaintiff’s president was satisfied with the conference, but a few hours later upon hearing a report of the conference the company treasurer urged plaintiff not to proceed with the contract until defendant’s decision was stated in writing.
Also upon returning to the Elverson plant the president found that a second shipment had come from Redstone, that 1,550 additional jackets had been cut and sent to the sewing room. He promptly advised the defendant that there was Redstone material in the second lay, which was in work, that he assumed the same ruling would apply as to the first lay, and that he would proceed accordingly.
Naturally all this slowed down recruitment and operation, but by October 18 plaintiff was ready to increase sewing room operation, except that no confirmation in writing of the decision by defendant had been received. Plaintiff’s president withheld pressing for recruitment while he endeavored to get a decision in writing. A night letter was sent to defendant on October 21, but it was not until November 2 that defendant confirmed its decision by letter of that date. Plaintiff received the letter November 3,1948.
The October and November delivery dates had passed before any deliveries were made.
Applications for extension of time were made to the contracting officer who assessed liquidated damages for a portion of the delay. This assessment was reversed by the Armed Services Board of Contract Appeals and appropriate extensions granted for delays caused by late delivery of government-furnished material and the difference in shade of part of the material.
From October 1 to 16, inclusive, the operations of plaintiff’s sewing room were unproductive. Virtually all the garments were ripped apart.. From October 17 to November 2 operations were limited. Plaintiff was unable to make full use of sewing room and facilities due to the failure of defend *370 ant to give written instructions as to the disposition of faulty material.
Plaintiff was definitely caused damages on account of wages paid, pay roll and other taxes, insurance on buildings and machinery, depreciation and use of facilities and gas and electricity, and incidentals. The part of these items of damage attributable to the defendant for the two periods we find to be $5,100.
Other items such as disruption of business and uncertainty, while real, are not of such a nature as to form the basis of a finding.
Plaintiff is entitled to recover the sum of $5,100.
It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OE FACT
The court makes findings of fact based upon the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, as follows:
1. On September 3, 1948, plaintiff, a Pennsylvania corporation, entered into a contract (No. W30-280-QM-9695) with the Department of the Army whereby plaintiff undertook to make for defendant 75,000 wool jackets, from materials supplied by defendant, for a total consideration of $493,750. The contract and specifications are in evidence as plaintiff’s Exhibits Nos. 1 and 2, which are incorporated herein by reference.
2. Defendant undertook to make the initial delivery of government-furnished material on September 15, 1948. Plaintiff undertook to deliver the jackets according to a stated schedule which called for 5,769 by October 31, 1948, and 11,538 (or 11,539) on the last day of each of the six months thereafter.
3. The specifications contained the following provisions:
All component parts of the garment shall be cut out of one piece of material * * *.
All component parts of jacket shall be marked or ticketed to insure a uniform shade and proper assembly throughout the garment * * *.
*371 4. Plaintiff’s plant was located at Elverson, Pennsylvania, a village 15 or 20 miles south, of Beading. Plaintiff’s president, who was also its general manager, had worked in the garment industry in New York for many years, and was qualified to organize and carry out the method of operation hereinafter described. In preparing to perform the contract in suit, plaintiff’s president went to New York and employed 15 key men, who reported at the Elverson plant on Monday, September 13,1948, to make ready for beginning operations upon receipt of the initial delivery of government-furnished material on Wednesday, September 15. Plaintiff provided these men with board and lodging, but did not pay them wages during that week. On Friday, September 17, after midday, no material having been received, the men were released. Most of them left Elverson at two o’clock that afternoon.
5. The initial delivery of government-furnished material arrived at plaintiff’s plant at 3:45 o’clock, p. m. on Friday, September 17, 1948.
Plaintiff’s president promptly telephoned as many of the 15 key employees as he could reach, and then went to New York to notify the others, to return for work. By the end of the following week, enough of the key men were on hand to carry forward plaintiff’s plan of operation.
6. Plaintiff’s plan, and subsequent method of operation, was to employ men and women (as many as might be needed) living in the vicinity of Elverson, who were untrained in the manufacture of garments, and to train them in their tasks, with the aid of the key employees as trainers and supervisors. The key employees were qualified and competent for the assignment. Plaintiff’s president anticipated that this method of operation would make plaintiff late in its initial deliveries by two or three weeks, but that after the plant was fully organized these delinquencies would be made up and remaining deliveries would be made on schedule.
7. Plaintiff’s method of manufacture was to unroll the cloth on a long cutting table; to lay the cloth 40 or 50 plies high; to mark the pattern on the top ply; and to cut the cloth according to pattern. A soabar fitter then fastened tickets on each part cut, to insure all parts of each garment *372 being made from the same piece of cloth. The cut parts were then removed in bundles from the cutting table to the sewing room, where the pieces were put together to form jackets.
8. Cutting operations were begun on Monday, September 20,1948. The first lay was comprised of 1,240 sets of parts, the cutting of which was completed on or about October 1, 1948. The cutting of a second lay of 1,550 sets was begun and completed shortly thereafter. Soabar tickets were applied as the parts were cut, and the parts were set aside in bundles for the sewing room.
9. On Monday, October 4,1948, one of plaintiff’s employees discovered and called to the attention of plaintiff’s president the fact that some of the jackets (then being made from the first lay) contained pieces which did not match. Further investigation revealed other jackets in which the colors were mismatched. The fault lay in the government-furnished material, some of which was shaded in the piece. Plaintiff’s president had never before encountered such a situation. More than a week passed before he found the source of the trouble on October 12,1948. In the meantime, he had begun the work of ripping the faulty garments apart in an effort to match them properly, had checked every operation and operator in the plant (with particular attention to the soa-bar), and had almost disrupted his organization by accusing employees of negligence and worse.
10. Immediately upon locating the source of the trouble plaintiff’s president called defendant’s- local inspector, who suggested a conference with defendant’s chief inspector in New York. The conference was held on October 13, 1948. Plaintiff’s president took some of the faulty cloth and some of the questionable jackets to New York for examination at the conference.
After examining the cloth and finding it shaded in the piece, the chief inspector conferred with the contracting •officer and other officials of the Quartermaster Corps, and then conferred again with plaintiff’s president. The chief inspector told plaintiff that the decision as to what to do in the matter would be confirmed in writing by the contracting officer, but that in the meantime plaintiff could proceed; that *373 the Government would pay for the jackets made from the faulty material; but that plaintiff should set aside all jackets in which the defect was visible at a distance of more than three or four feet, as to which special instructions would be issued to the inspector.
During the conference it was further determined that the supplier of the faulty material was the Bedstone mill.
11. Plaintiff’s president was satisfied with the results of the conference, and left it fully intending to proceed with the contract on the basis discussed, as he had told the chief inspector he would.
A few hours later, plaintiff’s treasurer (a major stockholder in the corporation), upon hearing a report of the conference, vigorously urged plaintiff’s president not to proceed with the contract until defendant’s decision was stated in writing.
The position taken by the treasurer of the corporation created a dilemma for plaintiff’s president. His solution of it is described in finding 14.
12. Upon returning to the plant at Elverson, plaintiff’s president examined the parts cut from the second lay of 50 plies, and found that 23 of them had come from Bedstone. The 1,550 jackets cut from the 50 plies had gone to the sewing room. He promptly advised defendant, by letter, that there was Bedstone material in the second lay, which was in work, that he assumed that the same ruling would apply as had been applied to the first lay, and that he was proceeding accordingly.
13. On the same day, October 14,1948, plaintiff’s president instructed his cutting room employees to segregate all of the Bedstone material. He estimated that this task would take two days (Thursday and Friday, October 14 and 15). He instructed the cutting room employees to start on Monday, October 18, with material from other mills.
14. Preparations for the recruiting of labor in the sewing room, when and as needed, had been made in September. When the shading difficulty was discovered on October 4, the recruitment was slowed as far as possible. It had been plaintiff’s plan to press the recruitment as rapidly as possible, once cutting operations were begun. When the shading *374 difficulty had been resolved, as far as cutting was concerned, on October 18, plaintiff was ready to increase sewing room operations according to plan, except for the fact that no confirmation in writing of the decision of defendant had been received. Plaintiff’s president therefore withheld pressing for recruitment of a full labor force, while he endeavored to get a written decision from defendant. A night letter was sent to defendant on October 21. Defendant confirmed the decision by letter dated November 2, which plaintiff received on November 3.
15. During the period October 1 through November 2, 1948, the only garment parts in plaintiff’s sewing room were the 2,790 jacket parts cut from the first two lays. Upon receipt of defendant’s letter of November 2, 1948, plaintiff put the 2,790 jacket parts aside, proceeded with other material, and began the full staffing of the sewing room.
16. The October and November delivery dates had passed before plaintiff made any deliveries, and plaintiff was 2y2 months late in completing the contract. Several applications were made by plaintiff to the contracting officer for extensions of time. Plaintiff considered the extensions granted to be inadequate. When the contracting officer assessed liquidated damages, plaintiff appealed. The Armed Services Board of Contract Appeals found that “an extension of time should be granted from 15 September 1948 to 3 November 1948 to compensate for the delays caused by the late delivery of government-furnished material and the difference in shade of part of that material * *
17. During the period October 1-16 (both inclusive), the operations of plaintiff’s sewing room were unproductive. Virtually all of the garments sewed were ripped apart.
During the period October 17 to November 2 (both inclusive), the operations of the sewing room were productive, in parts, but limited. Plaintiff was unable to make full use of its sewing room employees and facilities because of the failure of defendant to give written instructions regarding the disposition of the faulty material.
The unproductive operations of the first and second periods mentioned above, and the limitations upon productive operations in the second period, were caused by defendant’s delivery of faulty cloth.
*375 Plaintiff was definitely caused damages on account of wages paid, payroll and other taxes, insurance on buildings and machinery, depreciation and use of facilities and gas and electricity, and incidentals.
The loss resulting from unproductive operations and limitations upon the productive operations of the sewing room cannot be determined with mathematical precision. On the evidence as a whole the amount of damages is determined to be $5,100.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States five thousand one hundred dollars ($5,100).